

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00280-CV

_____

DIXIE HOUSE CAFÉ, INC., Appellant

V.

KAREN BRANDENBURG ECKMAN, Appellee

---

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 017-346910-23

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Karen Eckman obtained a no-answer default judgment against Dixie House Café, Inc. Dixie House filed a new-trial motion that the trial court denied. Raising a single appellate issue, Dixie House argues that because it presented evidence satisfying the *Craddock* factors, the trial court abused its discretion by failing to set aside the default judgment. *See Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124, 126 (Tex. [Comm'n Op.] 1939). Because the record supports the trial court's denial of Dixie House's new-trial motion on the ground that its failure to answer was intentional or the result of conscious indifference, we affirm.

## I. Factual and Procedural Background

Eckman worked as a server at Dixie House. Eckman alleged that male kitchen staff repeatedly harassed her, including making vulgar sexual comments to her, making sexualized gestures toward her, throwing hot food and gravy at her, and slapping her on her back and bottom.

Eckman said that she reported this conduct to her two managers, one of whom informed Dixie House's owner, Dale Simon. According to Eckman, because of her sexual-harassment complaint, Dale's wife, Theresa Simon, came to the restaurant to argue with Eckman. Eckman also alleged that the day after she made her sexual-harassment complaint, Dale fired her.

Eckman sued Dixie House for sexual harassment and unlawful retaliation. She repeatedly attempted to serve Dixie House through its registered agent, Dale, and

eventually obtained an order allowing substituted service. Eckman then served Dixie House by delivering the petition and citation to Shelly Minich—Dale's niece and a Dixie House office manager—at Dale's address.

Dixie House forwarded the petition and citation to a lawyer but did not file an answer. Eckman thereafter obtained a $215,000 default judgment against Dixie House.

Within 30 days of the default judgment, Dixie House moved for a new trial. Dixie House attached affidavits from its lawyer (Wes Dauphinot), Theresa, and Minich. We discuss those affidavits in greater detail below, but Dixie House generally alleged that it did not answer the lawsuit because of Dale's serious health issues (before the default judgment) leading up to his death (shortly after the default judgment). Eckman offered controverting evidence, including that Dale had a practice of declining service to delay and frustrate her and other litigants against Dixie House. The trial court held a hearing, considered the parties' evidence and arguments, and denied Dixie House's motion.

## II. Discussion

### A. The Applicable Standard of Review and the *Craddock* Test

We review the denial of a new-trial motion for an abuse of discretion. *B. Gregg Price, P.C. v. Series 1 - Virage Master LP*, 661 S.W.3d 419, 423 (Tex. 2023). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—

that is, if its act is arbitrary or unreasonable. *In re Acad., Ltd.*, 625 S.W.3d 19, 25 (Tex. 2021).

Under *Craddock*, a defaulting party is entitled to a new trial only when it proves the following three elements: "(1) the failure to appear was not intentional or the result of conscious indifference, but was the result of an accident or mistake, (2) the motion for new trial sets up a meritorious defense, and (3) granting the motion will occasion no delay or otherwise injure the plaintiff." *B. Gregg Price, P.C.*, 661 S.W.3d at 423–24 (quoting *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 925 (Tex. 2009)); *see Craddock*, 133 S.W.2d at 126. On the first element, conscious indifference means more than mere negligence and has been defined to mean "the failure to take action that would seem obvious to a reasonable person under the same circumstances." *McLeod v. Gyr*, 439 S.W.3d 639, 655 (Tex. App.—Dallas 2014, pet. denied); *see La. C Store Wholesaler, Inc. v. Royal Nett Apparel, LLC*, No. 02-17-00331-CV, 2018 WL 3059966, at *3 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.); *Sellers v. Foster*, 199 S.W.3d 385, 400 (Tex. App.—Fort Worth 2006, no pet.).

Conscious indifference is established when a defendant knew it was sued but did not care. *Fid. & Guar. Ins. Co. v. Drewery Constr. Co.*, 186 S.W.3d 571, 575–76 (Tex. 2006). And when a defaulting party relies on its agent to file an answer, the defaulting party must demonstrate that both it and its agent were free of conscious indifference. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992); *La. C Store Wholesaler, Inc.*, 2018 WL 3059966, at *3.

4

We look to whether the new-trial movant made factual assertions that, if true, negate intentional or consciously indifferent conduct and whether the non-movant controverted the movant's factual assertions. *See In re R.R.*, 209 S.W.3d 112, 115 (Tex. 2006). In determining this issue, we examine all the evidence in the record. *See id.*

Where, as here, both parties presented evidence at the new-trial hearing, we defer to the trial court's factual resolutions of conflicting evidence. *See La. C Store Wholesaler, Inc.*, 2018 WL 3059966, at *3. The trial court, as factfinder, may generally believe all, none, or part of the evidence and thus can reasonably believe, based on contradictory evidence, that a defendant behaved intentionally or with conscious indifference. *Id.* No abuse of discretion occurs when the trial court decides based on conflicting evidence, so long as some substantive and probative evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (op. on reh'g).

**B. Analysis**

We set out the following timeline to frame our discussion of each side's evidence:

- November 12, 2021: Eckman says Dixie House fired her on this date.

- September 29, 2023: Eckman sued Dixie House.

- October 5 and 13, 2023: Eckman attempted service through Dale; Minich told the process server that Dale was sick and out of the office and that she had left phone messages for Dale.

5

- January 31, 2024: Eckman served Dixie House through Minich.

- April 23, 2024: The trial court signed the default judgment.

- May 2, 2024: Dale died.

- May 21, 2024: Dixie House filed its new-trial motion.

### 1. Dixie House's New-Trial Evidence[1]

Dixie House presented affidavits from Theresa, Dauphinot, and Minich.

Theresa averred that she and Dale had opened several restaurants under the Dixie House name. Theresa's "role was only cooking at the restaurants[,]" and Dale "was in charge of all the day[-]to[-]day operations at the Dixie House restaurants." Minich, Dale's niece and an office manager for the restaurants, confirmed that Dale had been the president and head of operations for each restaurant.

Dauphinot averred that in late January of 2024, Dale notified him of Eckman's suit being served on Minich. Based on the officer's return, Dale could have called Dauphinot only on January 31—the date Dixie House was served. That same day, Minich emailed Dauphinot the petition and order allowing substituted service.[2]

---

[1]Because resolution of *Craddock*'s first factor is dispositive, we do not detail the evidence Dixie House proffered on *Craddock*'s other factors.

[2]Minich's affidavit does not mention Dixie House's being served or her communicating with Dale or Dauphinot about Eckman's suit. Rather, her affidavit denies various aspects of Eckman's lawsuit, including denying that Eckman ever reported any sexual harassment or that she had even sued the correct corporate entity.

Dauphinot averred that soon after receiving Minich's email, he notified Dale that for Dauphinot to defend Dixie House against Eckman's lawsuit, Dale needed to sign an attorney–client contract and pay a $5,000 retainer fee. According to Dauphinot, "Dale . . . indicated that he understood." But despite understanding what he needed to do, Dale never signed the contract and never paid the retainer.

Dauphinot's affidavit stated that in February, March, and April, Dauphinot set several appointments for Dale to consult about the case, sign a contract, and pay the retainer. "[E]ach time [Dauphinot] was supposed to meet with [Dale], [Dale] would cancel the appointment or just not show up." Dauphinot followed up, and Dale explained that "he was having trouble with his health and that he could barely move around." Throughout the process, Dauphinot said that he informed Dale he "could not take on legal representation without a signed attorney–client contract and payment of the retainer fee."

Theresa's affidavit stated that Dale's health had grown worse in 2023. She said Dale had a congestive heart issue that had steadily become worse, such that he could barely move. Theresa observed that Dale had trouble getting oxygen, "making it difficult for him to do anything." Theresa said that in Dale's final six months, "he would [lie] on the recliner at the house all day; at the end of the day, he would lean on [Theresa] to get up, and [she] would walk hand and hand with him into the bedroom, undress him, roll him over in bed and cover him up." She said she used the same process to help him go to the bathroom.

Theresa acknowledged knowing that Dale had canceled appointments to meet Dauphinot and hire him "because he physically had trouble walking or doing anything." But Theresa did not provide any testimony about Dale's mental functioning, who was running or making decisions about the Dixie House restaurants during Dale's health decline, or whether other arrangements could have been made to ensure that Dixie House had representation, including answering Eckman's lawsuit.

Dale's son-in-law delivered a copy of the no-answer default judgment to Dauphinot eight days after it was signed.[3] The next day, May 1, Dauphinot called and spoke with Dale, again notifying Dale that Dauphinot needed a signed agreement and retainer to proceed. According to Dauphinot, Dale told him that he could not walk ten feet without feeling out of breath but would try to make it to Dauphinot's office.

Sadly, Dale died the next day. And on that same day, Dauphinot averred that Dale's daughter and son-in-law came to Dauphinot's office with $5,000 in cash "saying that Dale had told them to give it to [Dauphinot]."[4] After reminiscing about Dale, Dauphinot gave them a copy of an attorney–client contract with instructions for Theresa to sign it. The next day, Dale's son-in-law returned with the executed

---

[3]The record is silent on the son-in-law's connection, if any, to Dixie House; how the son-in-law learned of the default judgment; or who prompted the son-in-law to deliver the default judgment to Dauphinot.

[4]No one objected to any of the affidavits in the trial court, and no one complains on appeal about the affidavits' contents.

agreement. Dauphinot then filed Dixie House's new-trial motion, seeking to set aside the default judgment.

Dixie House did not offer any medical evidence concerning Dale's mental or physical health, but Dauphinot's affidavit stated the following:

> It is clear to me that Dale . . . , registered agent of service and decision maker for the Dixie House restaurants, was prevented due to serious illness from acting more expeditiously on the papers served via substitute service on or about January 31 2024, and that, had he been in better health, he would have signed the attorney[–]client contract and paid my retainer fee promptly of me notifying him to do so.

### 2. Eckman's New-Trial Evidence

Eckman presented her own affidavit, which focused mainly on the allegations underlying her lawsuit against Dixie House, disputing many of the allegations in Minich's affidavit. Eckman also averred that Dale "[was] frequently sued and [had] a practice of declining service to delay and frustrate the opposing party." Eckman continued, "I have personally observed [Dale] engage in this practice." Eckman blamed Dale's refusal to accept service for the delay of her case but offered no testimony about Dale's health or any reason given for Dale's not otherwise acting sooner.

### 3. Application of Law to the Evidence

When a party attacks a default judgment by a new-trial motion, the critical question is, "Why did the defendant not appear?" *Milestone Operating, Inc. v. ExxonMobil Corp.*, 388 S.W.3d 307, 309 (Tex. 2012) (quoting *Fid. & Guar. Ins. Co.*, 186 S.W.3d at

9

574) (cleaned up). Here, Dixie House answers the question by pointing to Dale's health issues and claiming that he was too sick to retain counsel to file Dixie House's answer. Dixie House argues that "[a]n excuse need not be a good one to suffice" and directs us to the *Milestone* decision, in which the supreme court held that Milestone's registered agent's assertion that he "did not remember" being served and "did not remember" turning over the suit papers to Milestone's attorney provided a sufficient excuse under *Craddock*'s first element. *See id.* at 309–10.

But this case is not like *Milestone*. Texas courts have long held that a defendant's illness is not an excuse when, for example, the defendant had sufficient time to act but took no steps to answer, *see Heath v. Fraley*, 50 Tex. 209, 211 (1878), or when the defendant had an active business manager who could have answered but did not, *see Woytek v. King*, 218 S.W. 1081, 1081–82 (Tex. App.—Austin 1920, no writ).

In *Heath*, the supreme court stated that

> for a man too old and infirm to ride ten miles to court without having to stop twice on the way to rest, or to be able to get to court before its usual time of meeting in the morning, though he started at daylight, who takes no steps to have an answer filed until he should reach the court-house on default day, thus exhibits so palpable a manifestation of gross negligence as deprives him of all right to complain of the refusal of the court to set aside the judgment, even if he had shown a meritorious defense, instead of merely asserting that he has one.

50 Tex. at 211. Modern—post-*Craddock*—cases similarly look to whether a defaulting party with an alleged health issue had time to act but took no steps to prevent the default. *See, e.g.*, *Rodriguez v. Medders*, No. 10-11-00369-CV, 2012 WL 4862588, at *3–

10

4 (Tex. App.—Waco Oct. 4, 2012, no pet.) (mem. op.) (holding trial court did not abuse discretion in denying new-trial motion because the parties presented conflicting evidence on the first *Craddock* element: the defendants, who claimed a mistake or accident due to stress; and the plaintiffs, who portrayed the defendants as being intentionally or consciously indifferent to the proceedings); *Hyperoam, Inc. v. Valley Wireless Internet*, No. 13-04-180-CV, 2005 WL 1981505, at *3–4 (Tex. App.—Corpus Christi–Edinburg Aug. 18, 2005, no pet.) (mem. op.) (concluding trial court did not abuse its discretion in denying a new-trial motion even though the defendant claimed cancer as her excuse because the defendant took no steps to prevent default); *Zaidi v. Comm'n for Lawyer Discipline*, 252 S.W.3d 421, 424 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding party did not establish *Craddock*'s first element when the defaulting party presented evidence that she had been hospitalized for deep-vein thrombus but also stated she was able to complete research at the law library and was released from the hospital before trial).

Following *Heath*, we have also addressed the issue of a party's health under *Craddock*'s first element. *See Stum v. Stum*, 845 S.W.2d 407, 413–14 (Tex. App.—Fort Worth 1992, no writ), *disapproved of on other grounds by Humphreys v. Meadows*, 938 S.W.2d 750 (Tex. App.—Fort Worth 1996, writ denied). *Stum* involved a post-answer default, in which the defaulting party presented evidence that because her son had surgery and was hospitalized two weeks before trial, she did not attend trial. *Id.* at 413. We noted

11

that even though the defaulting party had two weeks' notice of the trial, she failed to request a continuance and took no steps to prevent the default. *Id.*

We observed that a sudden life-threatening event, such as an accident or illness, might be an excuse for a party's failure to appear. *Id.* at 413–14 (first citing *Walker v. Harris*, 227 S.W. 360, 361 (Tex. App.—Texarkana 1921, no writ) (attorney's wife was seriously injured in a car wreck on the day of the trial); then citing *Howard v. Emerson*, 59 S.W. 49, 50 (Tex. App. 1900, no writ)). But the facts of *Stum* did not pose a sudden life-threatening event or illness. *Id.* at 414. We thus stated that "[w]hen a defendant or attorney is absent because of illness, the defendant is usually required to demonstrate that he exercised due diligence in either employing another attorney or that he had insufficient time to take the necessary steps." *Id.* (citing *Heath*, 50 Tex. at 211). Because the defaulting party had the time but failed to act in *Stum*, we concluded that she had failed to satisfy *Craddock*'s first element. *Id.*

In this case, Dixie House's registered agent, Dale, communicated with an attorney the day Dixie House was served. Someone from Dixie House told office manager Minich to notify attorney Dauphinot, which Minich did. Dauphinot presented evidence for why he did not file an answer for Dixie House—because Dale, Dixie House's president, kept canceling or no showing for planned meetings, never signed an attorney–client contract, and never paid the retainer. But Dale ultimately did authorize paying the retainer—evidencing that he could have sooner authorized and arranged for the retainer's payment before Eckman obtained the default judgment.

12

Likewise, family members brought the attorney–client contract to Theresa after the default judgment's entry, and Theresa executed it, thereby authorizing Dauphinot to represent Dixie House. Dixie House failed, however, to offer any evidence why this was not done before the default judgment's entry. The evidence shows that Dixie House took no steps to prevent the default—other than Dale's initial phone calls with Dauphinot—until after being informed about the default judgment.

We are certainly sympathetic to the difficulties Dale's health issues likely played in running the multiple Dixie House restaurants and managing its and his personal affairs, including making decisions about Eckman's lawsuit. But like in both *Stum* and *Heath*, Dixie House, which had full knowledge of the lawsuit and understood what needed to be done, never took the steps necessary to engage its lawyer to act until after the default judgment's entry. *See Heath*, 50 Tex. at 211; *Stum*, 845 S.W.2d at 414.

Dixie House presented no evidence of anything that prevented Dale or Theresa—or anyone else acting on Dixie House's behalf during Dale's period of illness—from sending the $5,000 retainer sooner or having Dale's family members bring the engagement agreement to Dale or Theresa before the default judgment's entry.[5] If anything, the evidence shows that Dixie House waited to make these

---

[5]The trial court could have also considered Eckman's unobjected-to evidence that Dale had a history in prior lawsuits of delaying service and frustrating opposing parties.

13

decisions until after learning of the default judgment's entry (unfortunately, on the eve of and then after Dale's death).

For these reasons, we conclude that the trial court did not abuse its discretion by impliedly finding that Dixie House did not meet its burden on *Craddock*'s first element and by denying Dixie House's new-trial motion. We therefore overrule Dixie House's sole issue.

### III. Conclusion

Having overruled Dixie House's sole issue, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: January 23, 2025

14